UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CHICAGO TITLE INSURANCE COMPANY,      )
  *Third-Party Plaintiff*,      )
         )
*vs*.      )      1:11-cv-768-JMS-DKL
         )
NWJ INVESTMENT FUND, IV, LLC, &      )
NICKOLAS W. JEKOGIAN, III,      )
  *Third-Party Defendants*.      )

## ORDER

Presently pending before the Court is Third-Party Plaintiff Chicago Title Insurance Company's ("Chicago Title") Motion for Summary Judgment against third-party defendant Nickolas W. Jekogian, III.  [Dkt. 74.]  For the following reasons, the Court grants Chicago Title's motion in part.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. Pro. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a

genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. Pro. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment.  Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment.  *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact.  *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).  And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND

This dispute concerns real estate located in Johnson County (the "Property").  [Dkt. 76-1 at 2 ¶ 3.]  Wilson Group, Inc. ("Wilson Group") performed work for NWJ on the Property.  [*Id*.

- 2 -

at 3 ¶ 6.]  On November 8, 2007, Wilson Group filed a mechanic's lien on the Property in the amount of $515,419 for allegedly unpaid services it performed.  [*Id.* at ¶ 8.]

On April 14, 2008, NWJ executed and delivered a note in the original principal amount of $7,280,000 that was ultimately assigned to Federal National Mortgage Association ("Fannie Mae").  [*Id.* at 3 ¶ 9.]

On April 23, 2008, Chicago Title issued a title insurance policy (the "Policy") wherein it contracted to defend and indemnify Fannie Mae against any third-party claims adverse to its title and mortgage on the Property.  [*Id.* at 3 ¶ 5, 4 ¶¶ 12-13.]  Although Wilson Group had recorded its mechanic's lien on the Property before Chicago Title issued the Policy, the Policy did not list the mechanic's lien as an exception to its coverage.  [*Id.* at 4 ¶ 14.]  Chicago Title contends that it only issued the Policy without listing Wilson Group's mechanic's lien as an exception because Mr. Jekogian, the principal of NWJ, executed a document titled "Personal Undertaking" (the "Personal Undertaking").  [*Id.* ¶¶ 15-16.]  Mr. Jekogian argues that he signed the Personal Undertaking in his professional capacity on behalf of NWJ, not in his personal capacity.  [Dkt. 80-2 at 4.]

The Personal Undertaking lists Wilson Group's mechanic's lien as an exception to the title and provides, in relevant part, that as consideration for issuing the Policy,

> the undersigned, jointly and severally, for themselves, heirs, personal representatives, and assigns do hereby covenant and agree with [Chicago Title]:  1) to forever fully protect defend, and save [Chicago Title] harmless from and against all the Exceptions to Title, in and from any and all loss, costs, damages, attorneys' fees, and expenses of every kind and nature which it may suffer, expend or incur . . . ; 2) to provide for the defense, at their own expense, on behalf and for the protection of [Chicago Title] and the parties insured or who may become insured, against loss or damage under the Title Insurance Policy . . . ; [and] 3) to pay, discharge, satisfy or remove all or any of the items referred to above, when called upon by [Chicago Title] after receipt of notice by the undersigned, but in no event earlier than 10 days after receipt of the complaint to foreclose on the lien . . . .

[Dkt. 28-1 at 1.]   The Personal Undertaking provided two signature blocks, and Mr. Jekogian signed as follows:

[*Id.*]

On September 17, 2008, Wilson Group filed an action against NWJ in Indiana state court to foreclose on its mechanic's lien.  [Dkt. 76-1 at 4 ¶ 18.]  Wilson Group named Fannie Mae as a defendant in an amended complaint.  [Dkt. 76-4 at 2.]  In June 2010, the state court granted summary judgment in favor of Wilson Group and found that its mechanic's lien had priority over Fannie Mae's mortgage.  [Dkt. 76-1 at 5 ¶ 19.]  Wilson Group and NWJ subsequently filed a joint report to the state court, informing it of a separate lawsuit pending in federal court in Pennsylvania that NWJ had filed against Wilson Group related to various construction projects.  [Dkt. 76-6 at 3.]  Wilson Group and NWJ stipulated to the Indiana state court that they would be bound in the foreclosure action by any amount the Pennsylvania court determined was owed between the parties.  [*Id.*]  The Pennsylvania court ultimately determined that the balance NWJ owed Wilson on the mechanic's lien was $409,682.  [Dkt. 1-7 at 13.]

On February 18, 2009, Chicago Title sent a letter to Mr. Jekogian's attorney informing him that Fannie Mae had "tendered [the foreclosure] litigation to Chicago Title and we in turn

are tendering this to your client pursuant to his undertaking." [Dkt. 76-1 at 8.] The letter asked counsel to contact Chicago Title "to advise how Mr. [J]ekogian intends to discharge his responsibilities in this matter" and requested immediate action to "enable Chicago Title to avoid a loss, and your client to avoid any additional liability under the undertaking." [*Id.*]

On December 22, 2010, Wilson Group and NWJ entered into a settlement agreement and an agreed judgment in the Indiana foreclosure action, wherein NWJ stipulated that it had failed to pay Wilson Group $515,419. [Dkt. 1-9 at 4-5.] Those parties agreed to an *in rem* judgment in favor of Wilson Group for the same amount. [*Id.* at 6.] Mr. Jekogian signed the agreement on behalf of NWJ, indicating his title as "President." [*Id.* at 9.] NWJ later defaulted on the terms of the settlement agreement, and Wilson Group proceeded with enforcement of the mechanic's lien. [Dkt. 76-1 at 6 ¶ 27.]

Ultimately, the Indiana state court entered a decree of foreclosure in October 2011. [Dkt. 76-9.] It found that NWJ had defaulted in its obligations under the terms and conditions of Fannie Mae's note and mortgage by failing to pay the monthly installments as they became due, which accelerated the entire balance of the loan. [*Id.* at 7.] The state court found the amount due to Fannie Mae to be $9,427,231.98, exclusive of attorneys' fees, costs of collection, and other recoverable expenses. [*Id.* at 7-8.] It found a reasonable fee for Fannie Mae's attorneys to be $50,000. [*Id.* at 8.] Accordingly, the Indiana state court granted Fannie Mae an *in rem* judgment for $9,477,231.98. [*Id.* at 9.]

Fannie Mae sued Chicago Title in this action on June 7, 2011, alleging breach of contract and bad faith for not defending and indemnifying Fannie Mae against the mechanic's lien under the Policy. [Dkt. 1 at 6, 9-11.] Chicago Title later filed a third-party complaint against Mr. Jekogian and NWJ. [Dkt. 28.] In September 2011, Wilson Group, Fannie Mae, and Chicago

Title successfully mediated their claims.  [Dkt. 76-1 at 6 ¶ 29.]  To cure the mechanic's lien and resolve Fannie Mae's claims, Chicago Title paid $300,000 to Wilson Group and $50,065.68 to Fannie Mae.  [*Id.* at 5-6 ¶ 30, 74-75.]  Shortly thereafter, Fannie Mae and Chicago Title stipulated to the dismissal of Sallie Mae's action, leaving Chicago Title's third-party claim against NWJ and Mr. Jekogian still pending.  [Dkt. 35.]

Chicago Title has moved for summary judgment on its claims against Mr. Jekogian. [Dkt. 74.]  That motion is now fully briefed and ready for ruling.

## III.
### DISCUSSION

Mr. Jekogian does not dispute that the Personal Undertaking is a legally enforceable contract.  [Dkt. 28-1.]  Nor does he dispute that he signed it.  [*Id.*]  Instead, the primary dispute between the parties is whether Mr. Jekogian signed the Personal Undertaking on behalf of NWJ in his professional capacity or in his personal capacity.  [Dkt. 80 at 4.]  Mr. Jekogian further disputes whether Chicago Title provided proper notice to him of its claim and whether its asserted damages can be determined on summary judgment as a matter of law.  [*Id.* at 9-10.]

### A.  Applicable Law

The Court is exercising diversity jurisdiction over the remaining claims in this action, [dkts. 88; 89], so it will apply federal procedural laws and state substantive laws, *First Nat. Bank & Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 689 (7th Cir. 2004).

In Indiana, the interpretation of a guaranty is governed by the same rules applicable to other contracts.  *Caudill Seed & Warehouse Co., Inc. v. Rose Seeding & Sodding, Inc.*, 764 F. Supp. 2d 1022, 1028 (S.D. Ind. 2010) (citing *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind. Ct. App. 1993)).  In construing a guaranty, this Court "'must give effect to the intentions of the parties, which are to be ascertained from the language of the contract in light of

the surrounding circumstances.'" *Caudill*, 764 F. Supp. 2d at 1028 (quoting *Bruno v. Wells Fargo Bank, N.A.*, 850 N.E.2d 940, 945 (Ind. Ct. App. 2006)).  Specifically, the nature and extent of a guarantor's liability depends upon the terms of the contract, such that a guarantor cannot be made liable beyond the terms of the guaranty.  *Id.*  However, "the terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within their terms."  *Id.*

### B.  Signature Capacity

The primary dispute between the parties is whether Mr. Jekogian executed the Personal Undertaking on behalf of NWJ in his representative capacity, thus binding NWJ as the guarantor, or in his personal capacity, thus binding himself as the guarantor.  [Dkt. 80 at 4.]  Chicago Title contends that it only issued the Policy without listing Wilson Group's mechanic's lien as an exception because Mr. Jekogian, the principal of NWJ, signed a Personal Undertaking in his personal capacity.  [Dkt. 76-1 at ¶¶ 15-16.]  It points out that Mr. Jekogian did nothing to indicate that he was signing in a representative capacity on behalf of NWJ and that he signed under the signature block titled "FOR INDIVIDUALS."  [Dkt. 75 at 11-12.]

Mr. Jekogian argues that the signature block on the Personal Undertaking was inherently ambiguous and that he "had no right choice" for which portion of the signature block to sign because NWJ was a limited liability company, not a corporation.  [Dkt. 80 at 8.]  Alternatively, Mr. Jekogian argues that he thought the signature block titled "FOR CORPORATIONS" was reserved for Chicago Title's signature.  [*Id.*]

The goal of contract interpretation is to ascertain and give effect to the parties' intent, as reasonably manifested by the language of the agreement.  *Reuille v. E.E. Brandenberger Const., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008).  "[I]f the language is clear and unambiguous, it must be

given its plain and ordinary meaning." *Id.* An ambiguity does not arise simply because the parties disagree on the interpretation; instead, "language is ambiguous only if reasonable people could come to different conclusions about its meaning." *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) (citing *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005)). If a contract is ambiguous, the ambiguity can be either patent or latent. *RLI Ins.*, 543 F.3d at 390. A patent ambiguity is "apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning." *Id.* A latent ambiguity, on the other hand, arises only in the course of implementing the contract. *Id.*

Under Indiana law, whether a signer intended to act as guarantor in his personal capacity instead of representative capacity can be resolved as a matter of law and without a factual determination as to the parties' intent. *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 855 (Ind. Ct. App. 2007) (citing *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1263 (Ind. Ct. App. 1993)). A signature that does not identify the signer's representative capacity indicates the intent to be bound personally. *Jackson*, 877 N.E.2d at 856. Although an individual may not have subjectively intended to bind himself, subjective intent is largely irrelevant because "'the [C]ourt does not examine the hidden intentions secreted in the heart of a person, but, rather, examines the final expression found in conduct.'" *Id.* at 857 (quoting *Real Estate Support Serv., Inc. v. Nauman*, 644 N.E.2d 907, 910-11 (Ind. Ct. App. 1994)). The Court may consider the facts and circumstances leading up to the contract's execution to determine the capacity in which it was signed. *Jackson*, 877 N.E.2d at 857 (construing a signature to be in its individual capacity because signing in the official capacity would not have accomplished anything since company already owned debt).

Mr. Jekogian correctly notes that the Personal Undertaking does not identify the party intended to be bound by name, instead consistently referring to that party as "the undersigned." [Dkt. 80 at 7 (citing dkt. 28-1).]  The rest of Mr. Jekogian's arguments, however, are unpersuasive.  Mr. Jekogian signed the Personal Undertaking under a heading unambiguously titled "FOR INDIVIDUALS," and he did nothing to indicate that he was signing in his representative capacity on behalf of NWJ.  [*Id.*]  There is designated evidence that in at least two other instances, Mr. Jekogian had signed for NWJ and listed his title as "President", which indicates that he knew how to sign in his professional capacity.  [Dkts. 76-1 at 30, 71.]  Moreover, Mr. Jekogian's argument that he thought the "FOR CORPORATIONS" signature block was reserved for Chicago Title's signature is unpersuasive because that interpretation ignores the surrounding circumstances.  As Chicago Title points out in reply, that interpretation would result in Chicago Title binding itself to guaranty its own obligations in the Personal Undertaking.  [Dkt. 81 at 3 n.2.]

Based on Indiana case law, which the Court must apply in this diversity action, the Court concludes that the guaranty was not ambiguous and that Mr. Jekogian is bound by its terms in his personal capacity as a matter of law.  *See, e.g.*, *Jackson*, 877 N.E.2d at 856-57 (holding that a signature that does not identify the signer's representative capacity indicates the intent to be bound personally and that the Court may consider the surrounding circumstances to determine the signing capacity).

### C.  Notice

The Personal Undertaking requires Mr. Jekogian to "pay, discharge, satisfy or remove" the mechanic's lien "when called upon by [Chicago Title] after receipt of notice by [Mr. Jekogian]."  [Dkt. 28-1.]  The parties dispute whether Chicago Title provided notice to Mr. Jekogian.

Chicago Title emphasizes that the Personal Undertaking does not require a particular form of notice, that it delivered notice to Mr. Jekogian's attorney, and that Mr. Jekogian does not dispute receiving the notice.  [Dkt. 81 at 4.]  Specifically, Chicago Title cites two notices it sent to Mr. Jekogian's attorney regarding Mr. Jekogian's obligations under the guaranty.  [Dkts. 76-1 at 8-9.]  First, a letter it sent on February 18, 2009 stated that Fannie Mae had "tendered this [foreclosure] litigation to Chicago Title and we in turn are tendering this to your client pursuant to his undertaking."  [Dkt. 76-1 at 8.]  The letter asks counsel to contact Chicago Title "to advise how Mr. [J]ekogian intends to discharge his responsibilities in this matter" and requests immediate action to "enable Chicago Title to avoid a loss, and your client to avoid any additional liability under the undertaking."  [*Id.*]  A second letter sent to Mr. Jekogian's counsel on July 2, 2009, provides that while Chicago Title "understands the borrower from our insured has been active in the subject litigation, [Chicago Title] has not received any confirmation that it has accepted its obligations in this matter pursuant to the indemnity agreement with Chicago Title."  [Dkt. 76-1 at 9.]

Mr. Jekogian does not deny receiving the notices, but he argues that Chicago Title has not presented actual evidence that he received them.  [Dkt. 80 at 9.]  He claims that this presents an issue of fact.  [*Id.*]  Mr. Jekogian emphasizes that neither notice is addressed to him, although he does not dispute that they were addressed to his attorney.  [*Id.*]

Although the Personal Undertaking required Chicago Title to provide Mr. Jekogian with notice of its intention to call upon his obligations to resolve the mechanic's lien, it did not provide for a specific type of notice.  [Dkt. 28-1.]  A representative of Chicago Title has attested that Chicago Title sent two letters to Mr. Jekogian's attorney that provided notice of Mr. Jekogian's obligations under the Personal Undertaking.  [Dkt. 76-1 at 5.]  While Mr. Jekogian tries to create

an issue of fact regarding his receipt of those letters, he does not deny actually receiving them, and there is a presumption that a properly mailed letter is actually received. *Boomer v. AT & T Corp.*, 309 F.3d 404, 415 n.5 (7th Cir. 2002); *Conrad v. Univ. Fire & Cas. Ins., Co.*, 686 N.E.2d 840, 842 (Ind. 1997) ("Ordinary mail has been traditionally viewed as reasonably assured of delivery and as reliably fulfilling the purpose of providing notice.").

Mr. Jekogian's argument that the second letter is confusing because it uses the term "it" instead of "he" is not enough to create an issue of material fact. [Dkt. 80 at 5-6.] The first letter makes clear that Mr. Jekogian is being called upon personally to remedy the mechanic's lien and, as Chicago Title point out, Mr. Jekogian personally participated in the Pennsylvania litigation on his own behalf to reach a settlement to resolve a number of claims, including the mechanic's lien. [Dkt. 76-1 at 19-30 (Mr. Jekogian signing on behalf of NWJ as "President" and separately on his own behalf).] Although the terms of the settlement were not satisfied and summary judgment was later entered in Wilson Group's favor, Mr. Jekogian's participation shows that he was aware of the ongoing litigation surrounding the mechanic's lien and was personally involved in trying to resolve the matter.

For these reasons, the Court concludes that Mr. Jekogian has failed to create an issue of material fact regarding the notice Chicago Title provided him pursuant to the Personal Undertaking.

### D.  Damages

Chicago Title argues that because of Mr. Jekogian's failure to honor his obligations under the Personal Undertaking, it has incurred $393,367.07 in damages to cure the mechanic's lien and resolve Fannie Mae's claims in this litigation. [Dkt. 75 at 15.] Chicago Title categorizes its damages as follows:

- Settlement payment to Wilson Group, Inc. = $300,000

- Settlement payment to Fannie Mae = $50,065.68

- Attorneys' Fees = $43,301.39

[Dkts. 76-1 at 7; 76-2.]

      Mr. Jekogian argues that there is a question of material fact regarding Chicago Title's damages, but he only specifically challenges the $50,065.68 settlement payment Chicago Title made to its insured, Fannie Mae, to resolve Fannie Mae's bad faith claim against Chicago Title. [Dkt. 80 at 10.]  The Court agrees with Mr. Jekogian that a question of material fact exists regarding Chicago Title's settlement payment to Fannie Mae because it is unclear what portion, if any, of the settlement was for the alleged bad faith, Fannie Mae's attorneys' fees, or any other damages that may not be contemplated by the Personal Undertaking.  [*Id.*]  Accordingly, the Court cannot award Chicago Title these damages on summary judgment.

      Mr. Jekogian does not specifically challenge the other damages that Chicago Title seeks, and Chicago Title has presented sufficient evidence supporting those amounts.  Chicago Title designates an affidavit attaching its settlement agreement with Wilson Group and a check for $300,000 as evidence of the damages it incurred to resolve the mechanic's lien.  [Dkt. 76-1 at 10-17, 74.]  The Personal Undertaking gave Chicago Title the "sole discretion to pay, discharge, satisfy or remove from the title to said real estate all or any of the [liens] set out above[,]" [dkt. 28-1], and $300,000 is certainly reasonable considering that a court had already determined the balance due to Wilson Group on the mechanic's lien to be $409,682 in September 2010, [dkt. 1-7 at 13].  Accordingly, the Court awards Chicago Title $300,000 for damages it incurred resolving the mechanic's lien.

Chicago Title also provided an affidavit from its attorney with documentation supporting its fee request of $43,301.39.  [Dkt. 76-2.]  Mr. Jekogian does not argue that Chicago Title is not entitled to attorneys' fees or that the amount of fees it seeks is unreasonable.  [Dkt. 80 at 9-10.] Courts rely on the parties to know what is best for them and to advance the facts and arguments that entitle them to relief.  *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present . . . .  Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").  Accordingly, Mr. Jekogian having made no challenge, the Court awards Chicago Title $43,301.39 in attorneys' fees.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART** Chicago Title's Motion for Summary Judgment, [dkt. 74], such that summary judgment is entered in favor of Chicago Title on its claims against Mr. Jekogian and Chicago Title is awarded **$343,301.39** in damages.  The Court **DENIES** Chicago Title's request for an additional $50,065.68 in damages, stemming from a settlement with its insured, Fannie Mae.  Chicago Title's claim against NWJ Investment Fund IV, LLC remains pending, and no partial judgment shall issue at this time.  The Court requests that the Magistrate Judge schedule a conference to address resolution of any remaining claims and outstanding issues.

04/11/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

James A.L. Buddenbaum
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP-Lebanon
jbuddenbaum@parrlaw.com

James E. Carlberg
BOSE MCKINNEY & EVANS, LLP
jcarlberg@boselaw.com

Shawna Meyer Eikenberry
BAKER & DANIELS - Indianapolis
shawna.eikenberry@FaegreBD.com

Travis W. Montgomery
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP
tmontgomery@parrlaw.com

Carl R. Pebworth
BAKER & DANIELS - Indianapolis
carl.pebworth@FaegreBD.com

Michael L. Schultz
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP
mschultz@parrlaw.com

Charles T. Switzer
FAEGRE BAKER DANIELS LLP - Indianapolis
charles.switzer@FaegreBD.com

Mark A. Voigtmann
BAKER & DANIELS - Indianapolis
mark.voigtmann@FaegreBD.com